

Eric M. Creizman
Partner
(212) 735-8640
ecreizman@morrisoncohen.com

*Via Electronic Case Filing*

February 14, 2024

The Honorable Rachel P. Kovner
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
New York, New York 11201

**Re:** *United States v. Gary Peresiper*, <u>Index No. 18-CR-280 (RPK)</u>

Dear Judge Kovner:

I represent Gary Peresiper in the above-referenced case. I respectfully submit this letter memorandum in advance of Mr. Peresiper's sentencing hearing scheduled for February 20, 2024, at 12:30 p.m., to describe Mr. Peresiper's personal background, his good character, and relevant mitigating factors to assist the Court in fashioning an appropriate sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing under 18 U.S.C. § 3553(a).

**Preliminary Statement**

Mr. Peresiper pleaded guilty on January 23, 2019, to participating in a conspiracy between November 2010 and June 2013 to pay Medicare kickbacks. Both the government and Mr. Peresiper agree with the Probation Department's Guidelines calculation of 13, and his Criminal History Category of 1, which correspond to an advisory Guidelines sentencing range of 12 to 18 months of imprisonment. The Guidelines range is in Zone C of the Sentencing Table, and, as such, the advisory Guidelines provide that Mr. Peresiper's minimum term may be satisfied by a sentence of imprisonment or a sentence that substitutes home or community confinement for imprisonment up to half of his sentence. *See* U.S.S.G. § 5C1.1(c).



the fact that he is a first-time non-violent offender, the low likelihood of recidivism, and strong family support network, the Probation Department recommends a sentence of one year of probation. Based on those reasons, Mr. Peresiper's satisfaction in full of his forfeiture obligation of

$190,500 well in advance of sentencing, and for the other reasons set forth below, we respectfully request that the Court impose a non-custodial sentence.

**Personal Background**

**I.     Childhood**

At 58 years old, Gary Peresiper has faced and overcome substantial difficulties in his life. Born in Kishinev Moldova in 1965, Gary grew up in a challenging economic and political environment. His father was a shoemaker, and his mother was a midwife, physician's assistant, and school nurse. (PSR ¶ 55). For the first seven years of his life, Gary, his older brother, and his parents lived in a modest barn-style home with no running water. His family obtained drinking water from a well and used an outhouse for showering and bathroom needs. They relied on a coal furnace for heat. (PSR ¶ 58). When Gary turned eight, Gary's family was able to move to an apartment complex after winning a public housing lottery. Although public housing was an improvement over the family's prior living conditions, the water supply was inconsistent, leaving the family to rely on well water from time to time.

The Soviet Union, of which Moldova was then a part, was rife with antisemitism. Among other things, there were substantial restrictions on emigration and on the practice of the Jewish faith. Moldova, in particular, had a long history of virulent anti-Semitism, which included the Kishinev pogrom in 1903, in which 49 Jews were killed, 92 were seriously injured, a number of women were raped, and many Jewish homes and businesses were damaged. *See, e.g.,* Andrew Porwancher, *A 1903 Pogrom Sparked Calls for a Jewish State—to Prevent Attacks Like This One*, Washington Post, Oct. 14, 2023.[1] In that environment, Gary faced anti-Semitism at school and was often attacked and bullied, with only his brother coming to his aid. (PSR ¶ 59).

In 1977, when Gary was 12 years old, he emigrated with this family to the United States as refugees, which involved an arduous four-month journey through Czechoslovakia, Austria, and Italy. As Gary's older brother, Roman, recalls "[e]verywhere we lived, Gary and I had to work as the family's living expenses exceeded the allowance we received as refugees."[2] While the family lived in Ostia De Lido, a suburb of Rome, Gary worked nightshifts at a gas station and attended English lessons during the day.[3] Gary and his family eventually moved to the then working-class neighborhood of Ditmas Park in Brooklyn, where Gary thrived in his local public school, succeeding academically and excelling at athletics. He was also very popular among his

---

[1] *Available at* https://www.washingtonpost.com/history/2023/10/14/kishinev-pogrom-russia-israel-jews/.

[2] *See* Letter of Roman Peresiper, dated April 14, 2019 (Ex. 5). Mr. Peresiper's family members and friends wrote letters to the Court a few months after his guilty plea in January 2019. The letters preceded Mr. Peresiper's battle with cancer and his father's passing.

[3] Id.

peers. Gary's family lived modestly, and Gary did his part to contribute by taking on employment while attending high school.

### II.     Marriage and Family

In 1982, Gary enrolled in Brooklyn College, where he majored in accounting. During his sophomore year he met his future wife, Merav, who had immigrated with her family from Israel. In 1988, Gary and Merav married. As Merav recalls, "[n]either my parents nor Gary's were in any position to help us so we were pretty much on our own. We lived in [the] Luna Park projects in [Coney Island,] Brooklyn, where we welcomed [two] of our older boys (Eric and Brandon) into this world."[4] Gary pursued his career in accounting and earned his CPA license in 1992.

The early years of Gary and Merav's marriage were challenging. "Living in the projects was not easy with our cars being stolen and broken into on numerous occasions," according to Merav.[5] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

As if that were not enough, Gary's mother, at the age of 53, tragically died of stomach cancer in 1993. During that period, Merav's parents had a bitter divorce "which became very heated and ugly, tearing [her] family apart."[6] Despite these difficulties, Gary and Merav's commitment to each other and their children helped them endure. According to Merav, "[f]amily always comes first to us and has always [been] our way of life."[7]

As Gary's income increased, he and Merav were able to move Merav and the kids to the suburb of East Rockaway. Gary and Merav were devoted to ensuring that their children received a strong education and were well mannered. According to Merav, "[t]hat was not so easy living in the neighborhood with so many privileged children but Garys attitude was always true to the core to never have our boys forget where we and our parents came from."[8] Gary and Merav's emphasis on raising their children with proper values resulted in a remarkably close family bond. According to Gary's middle son, Brandon,

---

[4] Letter of Merav Peresiper, dated Apr. 27, 2019 (Ex. 1) at 1.

[5] Id.

[6] Id.

[7] *Id.* at 2.

[8] *Id.*

> My friends largely envy the relationship I have with my dad. Even as I reached my self-concerned teenage years in high school, I never shied away from giving my dad a hug or a kiss in front of my school peers. I can say with absolute certainty that there is nothing in this world that is more important to my father than his sons. . . . I cannot tell you how many times my friends would be more hands-on and play a larger role in their lives as my dad played in mine.[9]

Gary's son, Eric, similarly expresses profound admiration for his father:

> He has shown me and my brothers what it means to be a man. Not by his words but his actions. He has been there for each pivotal step in our lives always pushing us to be the best version of ourselves.[10]

Gary's longtime friend, Stephen Moelis, recounts a remarkable story that demonstrates how Gary instilled the value of empathy in his children:

> When our sons were eight years old, Tyler [Gary's youngest son] was invited to another boy's birthday party, while Ben was not. Ben was upset about being excluded. Ben received a call from Tyler the day before the party. Tyler asked Ben [whether] he wanted to go to a baseball game with him and Gary the next day. 'Aren't you going to the party?" Ben asked. "No, I'm going to a baseball game with you," Tyler replied. "My dad told me friends are more important than parties."[11]

Gary's children speak to his deep remorse over his participation in the offense at issue here. As Tyler writes in his letter to the Court,

> Unlike my two older brothers, I was there the day my father was arrested. I saw the pain in his eyes when he was handcuffed in front of his wife and youngest son and he could not even look at us. He was so disappointed in himself for making the mistake that he did. My love for my father can never be tarnished as I will be there for him every step of the way, as he would be for me.[12]

### III. Good character and charitable works.

The letters to the Court from Gary's family members and friends, attached as Exhibits 1-12, reflect a kind and devoted family man who is active in his community and does his best to improve the lives of others. Gary's compassion is genuine, and the assistance he provides is

---

[9] Letter of Brandon Peresiper, dated Apr. 22, 2019 (Ex. 3 at 1).

[10] Letter of Eric Peresiper, dated Apr. 30, 2019 (Ex. 2 at 1).

[11] Letter of Stephen Moelis, dated Apr. 14, 2019 (Ex. 9 at 2).

[12] Letter of Tyler Peresiper, dated Apr. 22, 2019 (Ex. 4) at 2.

done without seeking anything in return and shunning acclaim. As Stephen Moelis writes, "[t]here is always room for one more at Gary's dinner table. There is no help too difficult for Gary to undertake. There is no limitation to the support Gary offers to his family and friends."[13]

The letters submitted to the Court bear this out. For example, Karen Ayzenberg, a friend for over 25 years, writes that Gary took in her family and their dog when Superstorm Sandy destroyed their house "for as long as we needed to rebuild our home."[14] Cosmo Marfione, a business partner of Gary's, writes about how Gary hired Mr. Marifone as an intern to work on a real estate project, and became his mentor:

> When the interview concluded and before I left the trailer, Gary calls me into his office and begins talking to me. At that point, as suspected, I knew the internship wasn't of any interest to me. We started talking and from the very beginning of our conversation his empathy in understanding my position and then communicating in a heartfelt way my options for the future, I felt that I could align my values with his.
>
> ***
>
> That summer I found myself being excited the days that Gary would come on site. He would always allocate time during the day to teach me about deal structuring and financial analysis of commercial real estate projects.[15]

Rabbi Avrohom Rimler, who served as the rabbi of Gary's synagogue, describes Gary's devotion to helping others:

> From sitting into late hours during tax seasons preparing people's tax returns at no cost to them as they were elderly people who lived on very tight budgets to sponsoring Holiday Dinners at the local synagogue to sponsoring students at the University of SUNY Plattsburgh to the Chabad Center in Aventura where young adults who are victims of domestic abuse and depression, Gary always stood out with his generosity of not only generously contributing but with his time as well, which always demonstrates a true [soul] of a human being.[16]

Gary's empathy extends to animals as well, as a co-worker writes:

> Throughout my tenure at Changebridge I have also come to realize that Gary is the type of person that goes above and beyond to help anyone in need. While working at a construction site in Beacon, Gary was instrumental in putting together a fund to help

---

[13] Ex. 9 at 2.

[14] Letter of Karen Ayzenberg (Ex. 10).

[15] Letter of Cosmo D. Marifone, P.E., dated Apr. 29, 2019 (Ex. 7).

[16] Letter of Rabbi Avrohom Rimler, dated Apr. 12, 2019 (Ex. 6).

rescue several kittens from harm's way. We cared for them until they all received healthy and safe homes. Gary is a conscientious person and puts family and loved ones first.[17]

**A non-custodial sentence is sufficient, but not greater than necessary to satisfy the objectives of 18 U.S.C. § 3553(a).**

After determining a defendant's sentencing range under the advisory Guidelines, the district court must consider: "the nature and circumstances of the offense and the history and characteristics of the defendant," and impose a sentence that is sufficient, but not greater than necessary to satisfy the objectives of federal sentencing, including the need for the sentence imposed to: (i) reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; (ii) provide general deterrence; (iii) provide specific deterrence; and (iv) "provide the defendant with . . . medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1), (2). Although the district court must correctly calculate the Guidelines and consider them, the Guidelines calculation "must take second place" to the federal sentencing factors under Section 3553(a). *United States v. Gupta,* 904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).

I. **Gary Peresiper's history and characteristics and the nature and circumstances of the offense.**

Mr. Peresiper's history and characteristics are described above in this sentencing submission, as well as in the PSR and the attached letters. He is a 58-year-old man ███ ██████████████ who is kind, compassionate, and devoted to his family. His offense conduct and his substantial acceptance of responsibility is also set forth in the PSR and in the government's submission. In addition to the information contained in those submissions, it is noteworthy that Mr. Peresiper paid the entire amount of his forfeiture obligation of $190,500 three years and nine months in advance of his sentencing hearing.[18]

II. **The need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.**

There can be no dispute that Mr. Peresiper's offense is serious, but there is also no question that he fully accepted responsibility for his offense and has done everything he could in his power to rectify his wrongdoing. Mr. Peresiper's remorse and acceptance of responsibility should come as no surprise given that over his lifetime, he has demonstrated his upstanding

---

[17] Letter of Renee C. Ringler, dated Apr. 14, 2019 (Ex. 8).

[18] *See* Exhibits 13 (Preliminary Order of Forfeiture, dated Mar. 7, 2019), 14-17 (payment receipts).

character, always concerned about the welfare of others. In her letter to the Court, Mr. Peresiper's daughter-in-law captures Mr. Peresiper's exceptionally compassionate nature:

> Gary is so warm and considerate of others, always trying to do the right thing to make everyone else comfortable. . . . I have a difficult time opening up to people sometimes due to my anxiety, but Gary always makes me feel relaxed and at home. I know he would do anything for me . . . .[19]

When it comes to Mr. Peresiper's character and the values he instilled in his children, there is a Yiddish word that encapsulates this man: *menchlichkeit*, which includes the personal characteristics of decency, wisdom, kindness, honesty, respect, compassion, benevolence, and altruism. In these circumstances, while Mr. Peresiper's wrongdoing, which occurred over several years, was "not aberrant as defined by the U.S. Sentencing Guidelines," they were aberrant "as defined by Merriam Webster: . . . atypical." *United States v. Gupta*, 904 F.Supp. 2d 349, 354 (S.D.N.Y. 2012).

### III.   A non-custodial sentence is sufficient to satisfy the goals of specific deterrence.

It has been almost eleven years since the offense conduct at issue in this case concluded and almost six years since Mr. Peresiper was arrested. During his lengthy time under pretrial supervision, Mr. Peresiper has been fully compliant with all of the conditions of release. He has demonstrated that he will continue to be a productive member of society and that he will not reoffend. Although the PSR recommends a one-year term of Probation, it should be noted that Mr. Peresiper has been under scrutiny for many years, with his freedom of travel restricted, and he has demonstrated that he is extremely unlikely to find himself in the criminal justice system ever again.

Indeed, Mr. Peresiper's lengthy history of exemplary personal and professional conduct, his close family and community ties, his lack of a criminal record, his genuine efforts to make amends for his wrongdoing, and his good conduct since his arrest all demonstrate that the risk of recidivism here is negligible. *See, e.g. Pepper v. United States,* 562 U.S. 476, 492-93 (2011) (A defendant's post-offense conduct "may be taken as the most accurate indicator of 'his present purposes and tendencies and significantly suggest the period of restraint and the kind of discipline that ought to be imposed upon him.'") (citations omitted); *United States v. Desmond*, 2008 WL 686779, at * 3 (N.D. Ill. Mar. 11, 2008) ("The numerous letters received on behalf of Desmond show him to be an exceptionally caring and kind individual. The Court is confident that Desmond's error in judgment, which has already cost him dearly in terms of his career, finances and reputation, is a one-time occurrence."); *United States v. Yanza-Pailzaca*, 2010 WL 307954, at *2 (E.D.N.Y. Jan. 22, 2010) ("It is unlikely that [the defendant] will engage in further criminal activity in light of his moral nature, strong ties to family, and reputation for honesty.").

---

[19] Letter of Lauren Munick, dated Apr. 30, 2019 (Ex.12).

Empirical research strongly suggests that the likelihood of recidivism here is virtually nil. As an initial matter, the absence of any criminal history makes it highly unlikely for him to reoffend. According to research conducted by the Sentencing Commission, "recidivism rates are closely correlated with total criminal history points." U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, Mar. 9, 2017 at 7.[20] Offenders with zero criminal history points and no prior contact with the criminal justice system, like Mr. Peresiper, had an 11.7 percentage point lower recidivism rate than offenders with zero criminal history points and some prior contact with the criminal justice system. *Id.* at 6.

Furthermore, individuals convicted of an economic crime, like Mr. Peresiper, had the lowest rearrest rate of any category of offender. *Id.* at 12. *See also*, *United States v. Ward*, 814 F.Supp. 23, 24 (E.D. Va. 1993) (in granting downward departure for a 49 year-old, first-time, nonviolent offender, the court noted that "the length of time a person refrains from the commission of crimes, which is invariably tied to a person's age, is a factor that is critical to a court's determination of the sentence it should impose.").

Given Mr. Peresiper's age and his level of education, studies show that it is unlikely for him to reoffend. According to a Sentencing Commission study, recidivism rates decrease markedly as an individual gets older, and individuals age 60 or older are far less likely to reoffend than younger offenders. *See* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, Dec. 7, 2017, at 3.[21] And offenders over the age of 60 who were convicted of economic offenses are the least likely in that age category to reoffend. *Id.* In addition, among offenders age 60 or older, college graduates are less likely to reoffend than offenders with lesser education. *Id.*

Furthermore, aside from the collateral consequences that come with every criminal conviction, including the loss of certain civic rights, the embarrassment and shame that accompanies being a convicted felon, and the formidable restitution obligation he must incur, Mr. Peresiper's CPA license is in jeopardy and he will likely be suspended for some time, if not barred, from practicing as a CPA. In these circumstances, the "personal, business and family consequences . . . [Mr. Peresiper] experienced will likely deter him from future misconduct, which mitigates the need to protect the public from further crimes he might commit." *United States v. Redemann*, 295 F.Supp. 2d 887, 897 (E.D. Wisc. 2003). *See also, United States v. Adelson*, 441 F.Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd* 301 F. App'x 93 (2d Cir. 2008) ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); *United States v. Gupta*, 904 F.Supp. 2d 349, 351 (S.D.N.Y.

---

[20] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.

[21] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("[I]t seems obvious that, having suffered such a blow to his reputation, [the defendant] is unlikely to repeat his transgression[.]").

### IV. A non-custodial sentence is sufficient to satisfy the goal of general deterrence.

For largely the same reasons a non-custodial sentence is sufficient in this case to achieve specific deterrence, it is also sufficient to achieve general deterrence. Indeed, any citizen in Mr. Peresiper's circumstances "need only consider what happened to [him] in order to reconsider [committing a similar offense]; thus, general deterrence is served." *Redemann*, 295 F. Supp. 2d at 897. *See also, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith*, 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").

Furthermore, given that Mr. Peresiper's wrongdoing occurred over eleven years ago and that he has been under pretrial supervision for almost six years, that delay lessens the deterrent value of any sentence, and, in fact, the lengthy delay here may be considered punishment in itself. See, e.g., *Coleman v. Balkomb*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in denial of certiorari) ("The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted."); *United States v. Akers*, 499 F.Supp. 43, 45 (D.C. Or. 1980) (the "passage of five years [from the original sentence] may, in fact, affect both the objectives of deterrence and community disapproval, particularly when most of the delay is not attributable to the defendant, and when excessive delay, and the uncertainty which accompanies it, may well be, in itself, a severe punishment to the defendant.").

### V. A non-custodial sentence satisfies the need for the sentence imposed to provide Mr. Peresiper with needed medical care in the most effective manner.



[REDACTED]

As the Court is well aware, while the Bureau of Prisons may be effective in treating some medical conditions, [REDACTED]. Indeed, studies have well documented that health care in Bureau of Prisons facilities is complicated by inadequate staffing, lengthy wait times for treatment in outside hospitals, and failures in treating chronic conditions.[22]

**Conclusion**

For all of the foregoing reasons, we respectfully request that the Court impose a non-custodial sentence.

Respectfully submitted,

/s/ Eric M. Creizman
Eric M. Creizman

cc:   Patrick J. Campbell (by ECF and email)
      Trial Attorney, U.S. Department of Justice

      Frank Nikolaidis (by email)
      Senior U.S. Probation Officer

---

[22] *See, e.g.,* Dep't of Justice, OIG, *The Impact of an Aging Population on the Federal Bureau of Prisons*, Revised Feb. 2016 at 22, *available at* https://oig.justice.gov/reports/2015/e1505.pdf; Dep't of Justice, OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, Mar. 2016, *available at* https://oig.justice.gov/reports/2016/e1602.pdf; Walter Pavlo, *Federal Bureau of Prisons' Medical Care Falls Short of its Own Policy*, Forbes, Apr. 19, 2022, *available at* https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=758789085eab.